OPINION
{¶ 1} This is an appeal by defendants-appellants, Rocky Gasbarro,[1] Vincent Gasbarro, Alio Gasbarro (collectively "the Gasbarro family"), Midwest Farms, Inc. ("Midwest Farms"), Ohio Valley Poultry, Inc. ("Ohio Valley"), Elio International, Inc., Elio International Investment, Inc., Elio Investments International, Inc., and Alio International, Inc., from a judgment of the Franklin County Court of Common Pleas, finding in favor of plaintiff-appellee, Sanderson Farms, Inc., on appellee's claim to pierce the corporate veil of Midwest Farms and Ohio Valley, and impose personal liability on the Gasbarro family for alleged fraudulent conduct.
 {¶ 2} Appellee is a poultry processor and supplier, and, in 1993, appellee began selling poultry products to Midwest Farms. In February and March of 1996, Midwest Farms failed to pay the full amount for three truckloads of chicken it ordered from appellee. Midwest farms went out of business in July of 1996, leaving an unpaid debt to appellee of $118,214.50.
 {¶ 3} Appellee filed a complaint on January 3, 1997, and an amended complaint on October 16, 1998, alleging that appellants, after experiencing financial difficulties, and despite knowledge of insolvency and inability to pay, continued to order products from appellee while keeping and or transferring monies received for their own uses and purposes. Appellee alleged that the Gasbarro family's domination and control of Midwest Farms was used to commit unjust acts, including transferring corporate and individual assets to others, and creating Ohio Valley as a successor corporation to defraud creditors, including appellee. Appellee's complaint requested that the trial court pierce the corporate veil as to Midwest Farms and Ohio Valley, and to render judgment against appellants for alleged fraudulent transfers. Appellee sought compensatory damages, as well as an award of punitive damages and attorney fees.
 {¶ 4} On December 7, 1998, appellee filed a motion for summary judgment against Midwest Farms. By decision and entry filed January 15, 1999, the trial court granted appellee's partial motion for summary judgment against Midwest Farms for compensatory damages based upon breach of contract. The court's entry noted that issues remaining for trial included appellee's claims against the other appellants, as well as appellee's fraud claim against Midwest Farms, and appellee's request for punitive damages.
 {¶ 5} Those issues were tried before the court beginning on September 16, 1999. Evidence presented at trial indicated that Midwest Farms, which was incorporated in 1991 or 1992, engaged in the processing and wholesaling of poultry products; the company operated out of a location at 800 East Cooke Road, Columbus. Alio International, a corporation controlled by Alio Gasbarro, initially owned Midwest Farms, but the ownership of Midwest Farms was subsequently transferred to Alio Gasbarro's sons, Rocky and Vincent Gasbarro. Although there was conflicting testimony about Alio Gasbarro's alleged involvement with Midwest Farms, the evidence indicated that his two sons were responsible for handling the day-to-day operations of the business from the period of 1992 though 1996. Both sons learned the poultry business from their father, who had worked in the industry for approximately 50 years. After Midwest Farms experienced financial difficulties and ceased operations on July 27, 1996, the shares owned by Rocky and Vincent Gasbarro were transferred back to Alio International.
 {¶ 6} At trial, appellee introduced evidence of purported involvement by members of the Gasbarro family in a number of other companies: Ohio Valley, Alio International, Equity Equipment, Prime Equipment, Inc., and No Bones Brokerage. Ohio Valley was incorporated in the fall of 1995, and Rocky and Vincent Gasbarro were the sole shareholders, each owning 250 shares of stock in the company. In October of 1996, their shares in Ohio Valley were transferred to the "LMB Revocable Trust" (hereinafter "LMB Trust"),[2] at which time Irv Isaacson was named as president of Ohio Valley. Ohio Valley began operations from a location on North Sixth Street, Columbus, but eventually moved to 800 East Cooke Road after Midwest Farms went out of business in July of 1996.
 {¶ 7} Alio International[3] was formed in the late 1980s. Alio Gasbarro testified that he controlled Alio International, but that the purpose of the company was to benefit his three children. He further testified that Alio International frequently loaned money to Midwest Farms and Ohio Valley.
 {¶ 8} Rocky and Vincent Gasbarro owned Equity Equipment, and Rocky Gasbarro testified that he and his brother utilized the corporation to buy and sell equipment. Michael Gasbarro, a relative of the Gasbarro family, owned Prime Equipment, Inc., while Irv Isaacson, who had been an employee of Midwest Farms and, as noted above, was later named president of Ohio Valley in 1996, owned No Bones Brokerage.
 {¶ 9} Midwest Farms began experiencing financial difficulties beginning in 1995. Specifically, in April of 1995, an Immigration and Naturalization Service ("INS") investigation resulted in Midwest Farms losing 88 of its 100 employees because of immigration violations. At that time, Midwest Farms discontinued the process of deboning chicken and began processing boneless chicken. In March of 1996, Bobby Hill, appellee's credit manager, received a phone call from Rocky Gasbarro, informing him that Midwest Farms was experiencing problems because of actions by the company's controller. Gasbarro inquired about making informal payments toward the debt, and allowing further shipments to be made. On July 27, 1996, Midwest Farms ceased operations and, the following day, Ohio Valley began operating out of the same location.
 {¶ 10} At trial, appellee's counsel called accountant Steven Perdue as an expert witness. Perdue, who had reviewed the available financial records of Midwest Farms and Ohio Valley, opined that the Gasbarro family disregarded corporate formalities and diverted funds from Midwest Farms to themselves and to their related entities that would have otherwise been available to creditors.
 {¶ 11} By decision filed on March 6, 2001, the trial court pierced the corporate veil of Midwest Farms and Ohio Valley, finding that the Gasbarro family completely dominated and controlled Midwest Farms, Ohio Valley, Alio International, Equity Equipment Corporation and the LMB Trust, and that appellants knew or should have known that Midwest Farms was in "serious financial straits at the time of the orders and that payment to the [appellee] for the product was highly unlikely." The court further found that Midwest Farms, through the control of appellants, transferred the proceeds from the wholesale of the products to themselves or to other corporate entities under their control, and that assets that could have been used to pay appellee were transferred by various means to other corporate entities within their control. The court awarded appellee compensatory damages in the amount of $118,214.50, plus statutory interest, and punitive damages in the amount of $118,214.50. Following a separate hearing, the court also awarded appellee attorney fees.
 {¶ 12} On appeal, appellants set forth the following five assignments of error for review:
[I.] The trial court erred in piercing the corporate veil and entering judgment against Alio Gasbarro individually.
[II.] The trial court erred in piercing the corporate veil and entering judgment against Rocky and Vincent Gasbarro individually.
[III.] The trial court erred in permitting the appellants' former counsel to testify on behalf of appellee Sanderson in violation of the attorney-client privilege.
[IV.] The trial court erred in finding that Alio, Rocky and Vincent Gasbarro fraudulently transferred assets of Midwest Farms to themselves and Ohio Valley.
[V.] The trial court erred in awarding punitive damages and attorney's fees against appellants.
 {¶ 13} We will first address appellants' third assignment of error, under which it is asserted that the trial court erred in permitting appellants' former counsel to testify on behalf of appellee. Appellants argue that such testimony was admitted in violation of the attorney-client privilege.
 {¶ 14} By way of background, appellee's first witness at trial was Theodore R. Saker, an attorney who had previously represented the Gasbarro family regarding corporate matters. In an unrelated action brought prior to the instant case, Saker sued his former client, Alio Gasbarro, for legal fees. During that trial, Saker disclosed information that would otherwise have been privileged.
 {¶ 15} In the present case, Saker was questioned on direct examination about Alio Gasbarro's involvement with various companies, including Midwest Farms. Saker testified that, Alio Gasbarro directed the overall operations of Midwest Farms, and that he generally made the major financial decisions for that company even though the sons ran the daily operations. Thus, "whenever there were any disputes," or in situations involving "some extraordinary purchases of any kind the father would be consulted." (Tr. 17.)
 {¶ 16} During Saker's testimony, appellee introduced a copy of a decision rendered by the Franklin County Court of Common Pleas on July 12, 1999 (Saker Family Trust v. AlioInternational, Inc., Franklin C.P. No. 97CVE-07-7304), entering judgment against Alio Gasbarro for legal services rendered by Saker on behalf of Alio Gasbarro and other entities owned and/or operated by him. (Plaintiff's Exhibit No. 1.) In that decision, the trial court held that, "[a]lthough the shares of some of the corporations were in other names, the Defendant [Alio Gasbarro] still directed their overall operations and they still served as alter egos of the Defendant himself who made a practice of causing the corporations to come and go like the chickens being processed for the fast food market." Id.
 {¶ 17} Appellants contend that the testimony by Saker in the instant case involved matters learned through the attorney-client relationship, and that the trial court apparently assumed that those matters had been waived because of Saker's previous suit against his former client and Midwest Farms. Appellants maintain the record reflects no waiver, either express or implied, of the attorney-client privilege.
 {¶ 18} In response, appellee argues that appellants did not object to Saker testifying in this case, nor did appellants raise an "attorney-client privilege" objection; rather, it is contended, appellants only objected to matters involving: (1) the witness commenting on the waiver of the privilege; (2) relevancy as to time frames being discussed; (3) leading questions; (4) lack of foundation; and (5) form of question. Appellee further argues that appellants made no objection to the introduction of the trial court's decision and entry in the prior action brought by Saker.
 {¶ 19} Regarding the issue of the attorney-client privilege, one commentator has noted that the client is the holder of the privilege, and, therefore, "the power to waive it is his, and he alone, or his attorney or agent acting with his authority." 1 McCormick, Evidence (5 Ed.Strong Ed. 1999) 371, Section 93. However, "if the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to the communications so disclosed." Id., at 374. Thus, it has been held that "[a] client may not knowingly allow his attorney to testify without objection and later claim that the matters testified to were subject to the attorney-client privilege and that he did not waive the privilege." Fox v.California Sierra Financial Services (N.D.Cal. 1988),120 F.R.D. 520, 527. See, also, Love v. United States (C.A. 8, 1967),386 F.2d 260, 265 (failure of an appellant to object to testimony of attorney who represented him in earlier case constituted a waiver of attorney-client privilege).
 {¶ 20} Ohio courts have similarly held that the attorney-client privilege is subject to waiver where the client fails to object to the attorney's testimony. See Surovec v.LaCouture (1992), 82 Ohio App.3d 416, 421 (failure to timely object to any testimony that might otherwise have been subject to attorney-client privilege constitutes a waiver); State v.Karlen (Dec. 12, 1990), Summit App. No. 14462 (appellant "waived any challenge to the testimony by not asserting at trial that the testimony was inadmissible due to the attorney-client privilege").
 {¶ 21} In the present case, the record supports appellee's contentions that counsel for appellants did not object to Saker taking the stand, and that, while objections were raised during his testimony, no specific objection based on attorney-client privilege was asserted. Thus, for instance, the record shows that, when appellee's counsel questioned Saker on direct examination regarding which individual directed the overall operations of Midwest Farms, counsel for appellants raised an objection based on foundation, but not privilege. Such objection, however, was insufficient to place the trial court on notice that appellants may have been seeking to exclude privileged communications. See Nguyen v. Excel Corp. (C.A. 5, 1999),197 F.3d 200, 207, fn. 16, quoting 3 Weinstein's Federal Evidence (2Ed. 1999), Section 503.20(4)(b), at 503-66 (appellant's claim of the attorney-client privilege "`must be directed to specific questions * * * so that the trial court has enough information so as to rule on the privilege claim'"). Further, as noted by appellee, no objection was made to the introduction of the trial court's Saker Family Trust decision. Accordingly, we find that, having failed to raise specific, privilege-based objections at trial, appellants cannot challenge the admission of purported privileged statements for the first time on appeal.
 {¶ 22} Based upon the foregoing, appellants' third assignment of error is without merit and is overruled.
 {¶ 23} Appellants' first, second and fourth assignments of error are interrelated and will be considered together. Under the first and second assignments of error, appellants challenge the trial court's decision to pierce the corporate veil of Midwest Farms and Ohio Valley, thereby imposing personal liability on members of the Gasbarro family. Under the fourth assignment of error, appellants assert that there was insufficient evidence to support a finding of a fraudulent transfer.
 {¶ 24} The general rule is that corporations are distinct legal entities, and, thus, shareholders, officers and directors are not normally liable for the debts of the corporation.Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.Inc. (1993), 67 Ohio St.3d 274, 287. In Belvedere, supra, at paragraph three of the syllabus, the Ohio Supreme Court held that, in order to pierce the corporate veil and impose personal liability upon shareholders, it must be shown that:
* * * (1) [C]ontrol over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
 {¶ 25} Ohio courts have recognized that "[t]here is no precise test to determine whether the elements required to pierce the corporate veil have been satisfied, and each case should be `regarded as "sui generis" and decidable on its own facts.'"Lesick v. Medgroup Mgt., Inc. (Oct. 29, 1999), Hamilton App. No. C-990097. Further, in reviewing a trial court's decision to pierce the corporate veil, this court will affirm the judgment of the trial court if there is competent and credible evidence to support the trial court's decision to disregard the corporate structure and find that appellants should be held personally liable for the debts of their corporation. Id.
 {¶ 26} Appellants first challenge the trial court's finding that the Gasbarro family exercised such control over the corporations that they had no separate mind, will or existence of their own. The first prong of the Belvedere test is often referred to as the "alter ego doctrine." Frechette v. Kovanda
(Apr. 18, 2001), Summit App. No. 20207. To satisfy this requirement, a plaintiff must show that the individual and the corporation "are fundamentally indistinguishable." Id. InLeRoux's Billyle Supper Club v. Ma (1991), 77 Ohio App.3d 417,422-423, the court noted some of the factors used to determine if this standard has been met:
* * * (1) [G]rossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere façade for the operations of the dominant shareholder(s).
 {¶ 27} As noted under the facts, members of the Gasbarro family owned four corporations, Midwest Farms, Ohio Valley, Alio International and Equity Equipment, while another family member (Michael Gasbarro) owned Prime Equipment, and an employee (Irv Isaacson) of Midwest Farms (as well as an officer of Ohio Valley) was the owner of No Bones Brokerage. At trial, appellee's expert witness, Perdue, testified that the Gasbarro family, at a time when they had knowledge of Midwest Farms' financial difficulties, paid loans or diverted funds from Midwest Farms to either themselves or the various corporate entities rather than paying Midwest Farms' creditors. Although the records received from appellants through discovery were not complete, Perdue testified regarding documents covering January, February and June of 1996. According to Perdue, Midwest Farms paid Ohio Valley $196,657 in January of 1996, $120,062 in February of 1996, and $47,900 in June of 1996. Perdue, while noting the absence of any loan documents between Midwest Farms and Ohio Valley, testified that Midwest Farms, "for whatever reason, was paying Ohio Valley Poultry loan payments." (Tr. 127.) Further, Midwest Farms paid Alio International $187,000 in January of 1996, $16,000 in February of 1996, and $9,500 in June of 1996. Midwest Farms also paid $60,000 to Prime Equipment in June of 1996.
 {¶ 28} Additionally, there was evidence that Midwest Farms paid certain non-business expenses for Alio Gasbarro at a time when the corporation was in financial trouble. Specifically, on August 1, 1996, Midwest Farms paid a health insurance premium for Alio Gasbarro, and, in May of 1996, Midwest Farms reimbursed Alio Gasbarro $1,131.64 for trip expenses, including various personal items. After Midwest Farms ceased operations, Ohio Valley began paying health insurance premiums for Alio Gasbarro in the same manner previously undertaken by Midwest Farms. Appellee presented evidence that corporate formalities were disregarded in 1995, when Alio Gasbarro directed his sons to issue a check from the account of Midwest Farms in the amount of $50,000, representing a loan for one of Alio Gasbarro's friends who "got into a problem." (Tr. 75.)
 {¶ 29} Perdue further testified that appellants purchased product through Midwest Farms but sold it through Ohio Valley, thereby diverting funds to Ohio Valley that would otherwise have been available to benefit Midwest Farms and its creditors. He noted specific instances in which deliveries were made to Ohio Valley but paid through the checkbook of Midwest Farms. Despite appellants' contention that Midwest Farms paid Ohio Valley for the product, Perdue testified that, based upon his review of the documents submitted by appellants, in many instances there was no evidence that Ohio Valley reimbursed Midwest Farms for these items.
 {¶ 30} Perdue also testified that appellants failed to keep Midwest Farms and Ohio Valley separate in terms of assets, liabilities, products, equipment, supplies, personnel and customers. For example, he noted that the offices of Midwest Farms processed the payrolls for both Midwest Farms and Ohio Valley, and Perdue determined that employees of Midwest Farms also appeared on the payroll of Ohio Valley. Midwest Farms also performed administrative functions for both Midwest Farms and Ohio Valley, and Perdue noted a lack of documents indicating that Midwest Farms was reimbursed for those activities. After Midwest Farms ceased operations, almost all of the chicken processing equipment from that corporation was eventually transferred to Ohio Valley; further, Ohio Valley continued to make some payments on bills incurred by Midwest Farms, including payments to an accountant who prepared Midwest Farms' tax returns, and certain loans originating with Midwest Farms. Appellee also presented evidence showing that Midwest Farms provided start-up money for Ohio Valley.
 {¶ 31} Upon review, we find that there was competent, credible evidence to support a finding that the Gasbarro family disregarded corporate formalities, dominated and controlled the corporations, and diverted corporate funds for personal use. In light of evidence that the individual appellants exercised complete control over the corporations, the trial court did not err in finding that the corporations were no more than the alter ego of the Gasbarro family, thus satisfying the first prong ofBelvedere.
 {¶ 32} We note that appellants argue the trial court erred in holding Alio Gasbarro personally liable under an alter ego theory because, it is asserted, there was no evidence that he was an officer, director, shareholder, or in control of either Midwest Farms or Ohio Valley. In response, appellee argues that it presented evidence that Alio Gasbarro was a shareholder and vice-president of Midwest Farms. Specifically, appellee points to Plaintiff's Exhibit No. 3, a "certificate of amendment" by shareholders to the articles of incorporation of Midwest Farms, Inc., apparently executed on February 18, 1997, denoting Alio Gasbarro as "President" and Rocky Gasbarro as "Secretary."[4] Appellants contend that the exhibit at issue indicates that stock in Midwest Farms was not transferred to Alio International until after the transactions involving appellee and Midwest Farms. While the trial court noted in its decision that Rocky and Vincent Gasbarro were the sole shareholders and officers of Midwest Farms during the relevant period, the court nevertheless found that, Alio Gasbarro, as well as Vincent and Rocky Gasbarro, "completely dominated and controlled" Midwest Farms, Ohio Valley, and other related entities.
 {¶ 33} Upon review, even assuming that Alio Gasbarro was not a shareholder or officer of Midwest Farms during the relevant period, we conclude that the record supports the trial court's finding that Alio Gasbarro exercised significant control over Midwest Farms during the time of the transactions between appellee and Midwest Farms. As previously discussed, Alio Gasbarro's former counsel, Saker, testified that Alio Gasbarro directed the overall operations of Midwest Farms, and, while there was evidence that the sons handled the day-to-day operations, Saker testified that any extraordinary purchases required the input of Alio Gasbarro. Saker further noted that Alio Gasbarro performed a substantial amount of work on behalf of Midwest Farms.
 {¶ 34} Saker's testimony, however, was not the only evidence presented regarding the issue of Alio Gasbarro's control over Midwest Farms. At trial, appellee questioned Alio Gasbarro regarding a loan transaction, noted above, in which Midwest Farms wrote a check in the amount of $50,000 to a friend of Alio Gasbarro. The evidence surrounding this transaction indicates that, Alio Gasbarro, ostensibly acting on behalf of Alio International, wanted to help out a friend, Lenny Lubin. Alio International, however, did not issue the check to Lubin; rather, Alio Gasbarro directed his sons to issue the check from the account of Midwest Farms. When asked why his sons would have written a check to Lubin from the account of Midwest Farms, Alio Gasbarro responded, "[b]ecause I told them to." (Tr. 76.)
 {¶ 35} Additionally, Rocky Gasbarro testified that his father took monies or assets from other corporations and "funneled" them through Alio International. Alio Gasbarro acknowledged during his testimony that Alio International was set up for the benefit of his sons, Rocky and Vincent, and daughter, Tracie Jo. Further, around the time Midwest Farms ceased operations, Alio Gasbarro instructed his son Rocky to transfer his shares of Midwest Farms to Alio International. Regarding the LMB Trust, the vehicle into which shares of Ohio Valley were eventually transferred, Rocky Gasbarro acknowledged he was unsure about the purpose of the trust, but he testified that his father "wanted the company to be structured that way," and that "I followed his instructions[.]" (Tr. 59.)[5] Alio Gasbarro acknowledged that he contacted the future trustee of the LMB Trust because, "[t]hey needed money to get Ohio Valley Poultry going, and I got an investment going and I got an investment for them[.]" (Tr. 83.)
 {¶ 36} It has been held that, "in applying the `instrumentality' or `alter ego' doctrine, the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit,Co. (C.A. 4, 1976), 540 F.2d 681, 685. Thus, in certain instances, courts have looked beyond the issues of ownership interest or title to determine whom the controlling party really is. Id. See, also, Miramax Film Corp. v. Abraham (Nov. 25, 2003), S.D.N.Y. No. 01 CV 5202 ("Even the absence of proof that Abraham has any ownership interest in Phoenix, or is an officer or director of the corporation, does not foreclose the possibility that Abraham was the controlling party over Phoenix with regard to the transaction at issue"); Henderson v. Rounds Porter Lumber Co. (W.D.Ark. 1951), 99 F. Supp. 376, 383-384 ("the real basis of liability is actual control and manipulation of the [subservient corporation], whether that control and manipulation be exercised by virtue of stock ownership or otherwise").
 {¶ 37} In the present case, despite the fact Alio Gasbarro may not have been a shareholder or officer of Midwest Farms at the time of the transactions between that corporation and appellee, the evidence indicates that he was in a position to, and did in fact, act as a controlling force behind the actions of Midwest Farms. To ignore the facts regarding the control exercised by Alio Gasbarro over the corporation based solely upon shareholder or officer status would be to elevate form over reality, to the detriment of creditors. DeWitt Truck, supra. Nor are we persuaded that controlling law requires us to disregard such evidence in considering the issue of personal liability under an alter ego theory.
 {¶ 38} Under the second prong of Belvedere, the party seeking to pierce the corporate veil must establish that "the shareholder exercised the control established under the first prong of the test to commit fraud or other wrongful conduct."Stypula v. Chandler, Geauga App. No. 2002-G-2468, 2003-Ohio-6413, at ¶ 19. While the court in Belvedere employed the words "fraud or illegal act," Ohio courts, including this court, have held that the second prong is satisfied when "unjust or inequitable" consequences occur. Dalicandro v. Morrison RoadDevelop. Co., Inc. (Apr. 17, 2001), Franklin App. No. 00AP-619, citing Cent. Benefits Mut. Ins. Co. v. RIS Admrs. Agency, Inc.
(1994), 93 Ohio App.3d 397, 404, and Pritchett, Dlusky Saxe v.Pingue (Sept. 16, 1997), Franklin App. No. 96APE11-1598. See, also, Wiencek v. Atcole Co., Inc. (1996), 109 Ohio App.3d 240,245 ("we hold that one seeking to disregard the corporate entity may present evidence that the shareholders exercised their control over the corporation in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity in order to satisfy the second prong of the test enunciated in Belvedere");Stypula, supra, ("the corporate veil may be pierced when the acts would lead to unfair or inequitable consequences").
 {¶ 39} In the present case, there was sufficient, credible evidence to support the trial court's finding that appellants' conduct in ordering product from appellee under circumstances in which appellants knew or should have known that Midwest Farms would be unable to pay, and in diverting corporate and individual assets to themselves and other related entities instead of making payments to creditors, resulted in unjust consequences to appellee. Further, in considering the third prong of Belvedere, the evidence supported the trial court's finding that appellee suffered a loss in the amount of $118,214.50 because of the acts of appellants. Accordingly, based upon evidence that the Gasbarro family disregarded corporate formalities, dominated and controlled the corporations, diverted funds, and that such conduct resulted in unjust consequences and loss to appellee, the trial court did not err in piercing the corporate veil.
 {¶ 40} We next consider appellants' contention that the record does not support a finding of any fraudulent transfers by appellants. The Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336, creates a right of action for a creditor to set aside an allegedly fraudulent transfer of assets. R.C. 1336.04(A) provides that:
A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 {¶ 41} The issue concerning fraudulent intent is to be determined based upon the facts and circumstances of each case, and "[t]he burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant."Stein v. Brown (1985), 18 Ohio St.3d 305, 308. However, in order to succeed on a fraudulent transfer claim, a creditor need not prove the elements of common-law fraud. Lesick, supra. Because of the difficulty in obtaining direct proof of fraudulent intent, "courts have recognized certain `badges' or indicia of fraud, circumstances which usually or frequently attend a conveyance designed to hinder, delay, or defraud a creditor, which in concert with other suspicious circumstances, are considered sufficient to prove fraudulent intent." BarbeeConcrete Constr. v. Bachinski Builders, Inc. (Nov. 20, 1997), Franklin App. No. 97APE03-397.
 {¶ 42} R.C. 1336.04(B) sets forth several of the well-established "badges" of fraud, and states as follows:
In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:
(1) Whether the transfer or obligation was to an insider;
(2) Whether the debtor retained possession or control of the property transferred after the transfer;
(3) Whether the transfer or obligation was disclosed or concealed;
(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
(5) Whether the transfer was of substantially all of the assets of the debtor;
(6) Whether the debtor absconded;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.
 {¶ 43} R.C. 1336.05 pertains to situations in which a creditor's claim against a debtor arose before the transfer took place. Under R.C. 1336.05(A), a transfer by a debtor is fraudulent if the debtor transfers assets "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer[.]" Pursuant to R.C. 1336.05(B), a transfer is fraudulent if a debtor makes a transfer to an insider at the time the debtor is insolvent, and the insider had reasonable cause to believe the debtor was insolvent. An "insider" is defined to include directors, officers, or persons in control of the debtor corporation, and relatives of a general partner, director, officer or person in control of the debtor corporation. R.C. 1336.01(G)(2).
 {¶ 44} There are two basic definitions of insolvency: (1) the balance sheet approach which determines whether assets exceed liabilities; and (2) the equitable test that "looks at cash flow and whether the debtor has an ability to pay debts as they become due." Aristocrat Lakewood Nursing Home v. Mayne (1999),133 Ohio App.3d 651, 664, fn. 11. See, also, R.C. 1336.02(A)(1) ("A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation"), and R.C. 1336.02(A)(2) ("A debtor who generally is not paying his debts as they become due is presumed to be insolvent").
 {¶ 45} In the present case, the trial court made the following findings regarding evidence as to transfers made by appellants:
The Court is not convinced that any of the Defendants intentionally defrauded the Plaintiff at the time the product was ordered, however, Alio, Rocky, and Vincent Gasbarro knew or should have known that Midwest was in serious financial straits at the time of the orders and that payment to the Plaintiff for the product was highly unlikely. Furthermore, it is apparent to this Court that Midwest, through the control of the Gasbarro's transferred the proceeds from the wholesale of the products to themselves or to other corporate entities within their control. In addition Midwest corporate assets that could have been used to pay Plaintiff were transferred by various means to other corporate entities dominated by the Gasbarro Family. For instance, Midwest stopped doing business near the end of July, 1996. [Ohio Valley Poultry, Inc.] opened its doors and began business the very next day. [Ohio Valley Poultry, Inc.] used the same equipment and employees that Midwest had used the day before. Furthermore, some of the equipment was sold by Midwest to Prime Equipment, Inc.; and No Bones Brokerage, Inc. at a deflated price. Those corporate entities then sold the very same equipment to [Ohio Valley Poultry, Inc.] at an inflated price thus minimizing the assets of Midwest. The evidence further showed that these were mere paper transactions as the equipment never moved. It was Midwest's one-day and [Ohio Valley Poultry, Inc.'s] the next with the profit from the transaction funneled into companies dominated by the Gasbarro Family and associates.
The record of this case is replete with other examples of Midwest being raided as its business wound down so that Plaintiff had no chance to recover its damages from Midwest.
 {¶ 46} Upon review, there was competent, credible evidence to support the trial court's finding that the Gasbarro family transferred funds from Midwest Farms to themselves or entities they controlled, and there was further evidence that such transfers were made at a time when Midwest Farms was insolvent. Specifically, we have previously noted testimony by Perdue that Midwest Farms, in January, February and June of 1996, made payments of more than $650,000 either to members of the Gasbarro family or to their related entities, including more than $250,000 diverted to Alio International in 1996, and over $368,000 to Ohio Valley. The transfer of funds by Midwest Farms to Ohio Valley and Alio International involved the transfer of assets to insiders, as Ohio Valley and Alio International were corporations that the Gasbarro family controlled.
 {¶ 47} Appellants argue generally that payments by Midwest Farms to Alio International and Ohio Valley included loan repayments, commissions and brokerage fees. Appellants assert that Alio International repeatedly loaned money to Midwest Farms to assist with its cash flow problems. Assuming that certain transfers involved loan repayments, the trier of fact was not required to find that such loans were made in "the ordinary course of business." See R.C. 1336.08(E)(2). Rather, the record does not contain loan agreement documents, nor is there evidence regarding interest rates or other ordinary business terms. Rocky Gasbarro acknowledged on cross-examination that not all the transactions were loans, and that he would often just contact Alio International, indicate he needed money, and it would be sent. Appellee's expert, Perdue, noted that, as between Midwest Farms and Ohio Valley, he "could not find documentation in their files of any loans existing between the two companies." (Tr. 127.) Perdue similarly testified that commission statements did not have calculations to support them. While noting the "ease and regularity" with which these checks were written, he stated there was "no calculation, no methodology except for regularity." (Tr. 250.)
 {¶ 48} Regarding the issue of insolvency, the evidence indicated that, Midwest Farms experienced financial difficulties beginning in October of 1995, and Alio Gasbarro acknowledged that he was aware of Midwest Farm's insolvency in the fall of 1995. Appellee's expert, Perdue, testified, "we have an insolvency judgment in my opinion as of the end of December [1995] just on receivables and payables alone." (Tr. 483.) Perdue identified a tax document for 1995, indicating current assets in the amount of $1,310,000, and current liabilities of $2,343,000. Thus, the expert noted, as of the end of 1995, "current assets were well exceeded by their current liabilities." (Tr. 110.) Perdue noted that, in January of 1996, Midwest Farms showed accounts receivable from their sales records of $708,000, while owing $1,179,000 in short-term liabilities for trade payables; in February of 1996, customer accounts receivable totaled $614,000, while trade payables were $1,311,000; in June of 1996, Midwest Farms had accounts receivable of $555,000, while payables totaled $1,679,000.[6] Further, at the end of 1995, as well as in March of 1996, Midwest Farms' line of credit with its lending bank carried a negative account balance of more than $500,000.
 {¶ 49} Thus, the record contains competent, credible evidence that Midwest Farms, while insolvent, transferred assets to insiders, such transfers being fraudulent pursuant to R.C.1336.05(B).
 {¶ 50} In addition to the provisions of R.C. 1336.05, a creditor may prove a claim for fraudulent transfer independent of when the creditor's claim arose by satisfying the elements of R.C. 1336.04. Lesick, supra. R.C. 1336.04(A)(1) describes actual intent to hinder, delay or defraud creditors, while R.C.1336.04(A)(2) describes constructive intent to hinder, delay or defraud creditors. Aristocrat Lakewood Nursing Home, supra, at 662. As noted above, R.C. 1336.04(B) sets forth several "badges of fraud," including: (1) whether the transfer was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer was of substantially all of the assets of the debtor; (4) whether the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred; and (5) whether the debtor was insolvent or became insolvent shortly after the transfer was made.
 {¶ 51} In the present case, there are sufficient "badges of fraud" to support a finding of actual fraud under R.C. 1336.04. A review of the evidence indicates that, the Gasbarro family utilized Ohio Valley as essentially a "successor" corporation, allowing it to carry on the business of Midwest Farms, while retaining that corporation's assets and keeping them out of the reach of creditors. As previously noted, there was evidence that, during 1996, Midwest Farms ordered and paid for product that was later sold by Ohio Valley, thereby diverting funds to Ohio Valley that otherwise would have been available to pay creditors of Midwest Farms. The record further supports the trial court's finding that, on the day after Midwest Farms ceased doing business, Ohio Valley began operating out of the same location (800 Cooke Road) formerly used by Midwest Farms. Perdue testified that, although there were transactions between Midwest Farms and Ohio Valley in early 1996, the accounting records for Ohio Valley "show general ledger activity seemingly to start in July, August, and September of 1996." (Tr. 141.) Vincent and Rocky Gasbarro, as shareholders of both Midwest Farms and Ohio Valley, were beneficiaries of the transfer of assets, retaining control of the property. When asked by the trial court what would have been different had someone walked into Ohio Valley the day after Midwest Farms closed, Rocky Gasbarro responded, "everything pretty much would have been the same." (Tr. 490.)
 {¶ 52} Ohio Valley also utilized equipment formerly owned by Midwest Farms, and Ohio Valley had some of the same employees and customers as Midwest Farms. Rocky Gasbarro acknowledged that he transferred his accounts from Midwest Farms to Ohio Valley. The transfer of accounts from one business to another falls under the ambit of a transfer of an asset pursuant to Ohio's Fraudulent Conveyance Statute. Link v. Leadworks Corp. (1992),79 Ohio App.3d 735, 745. Further, appellee presented evidence that Midwest Farms provided the start-up money for Ohio Valley.
 {¶ 53} As noted, the trial court found that Midwest Farms sold some of its assets to closely-related entities at a "deflated price," i.e., without receiving a reasonably equivalent value. The evidence supports a finding that, through a series of transactions, assets of Midwest Farms were sold and transferred to entities either owned or closely related to the Gasbarro family, and eventually sold to Ohio Valley. According to appellee's expert, the equipment sold by Midwest Farms was not accomplished in a manner calculated to maximize the amount of money Midwest Farms should have received. For instance, Midwest Farms sold office equipment to No Bones Brokerage for $11,800, but that same equipment was later sold to Ohio Valley for $28,695. Rocky Gasbarro acknowledged that the equipment Midwest Farms sold to No Bones Brokerage never left the location of 800 East Cooke Road. Midwest Farms also sold chicken processing equipment to Prime Equipment, Inc. for $74,200, and the same equipment was subsequently sold to Ohio Valley for $212,280.
 {¶ 54} Appellants contend that the testimony of Rocky Gasbarro established that the equipment was sold for a reasonable value to the other entities, and that the equipment was refurbished before being sold to Ohio Valley. The trier of fact, however, rejected this argument, finding Rocky Gasbarro's testimony on this issue to be less than credible. We note that, during trial, the trial judge specifically questioned Rocky Gasbarro about the fact that equipment was sold by Midwest Farms to other related entities for a price lower than what Ohio Valley eventually paid for these assets. Specifically, the trial judge sought to clarify whether "the profit or difference * * * ends up spread * * * over a number of entities closely held by you and your family as opposed to going back to Midwest Farms[.] Am I missing something?" (Tr. 424.) Rocky Gasbarro responded, "No." (Tr. 424.)
 {¶ 55} Upon review, we conclude that there was competent, credible evidence to support a finding of liability against appellants under Ohio's Fraudulent Conveyance Act, and that such finding was not against the manifest weight of the evidence. Based upon the foregoing, appellants' first, second and fourth assignments of error are not well-taken and are overruled.
 {¶ 56} Under the fifth assignment of error, appellants assert that the trial court erred in awarding punitive damages and attorney fees. Appellants argue that appellee made no showing of actual malice or conscious disregard on the part of Midwest Farms; appellants maintain that the record indicates cooperation, rather than malice, on their part in attempting to resolve all outstanding debts. Appellants cite the trial court's finding that it "is not convinced that any of the Defendants intentionally defrauded the Plaintiff at the time the product was ordered," and appellants further note that the trial court's decision lacks any finding of actual malice by any of the appellants. Finally, appellants argue that, because there is no basis for an award of punitive damages, this court should likewise reverse the award of attorney fees.
 {¶ 57} Under Ohio law, punitive damages and attorney fees may be awarded when appropriate in fraudulent conveyance cases.Aristocrat Lakewood Nursing Home, supra, at 672. In order to recover punitive damages, a creditor must not only establish the underlying cause of action for the fraudulent transfer, but must also prove that the debtor acted with actual malice when making the fraudulent transfer. Id., at 672-673. A finding of "actual malice" requires proof that the debtor acted in the form of either: "(1) hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights of others that had a great probability of causing substantial harm." Id., at 673.
 {¶ 58} Generally, "[t]he reason behind awarding punitive damages in Ohio `* * * has been recognized * * * as that of punishing the offending party and setting him up as an example to others that they might be deterred from similar conduct.'" Wattv. Rick Metz Developer, LLC, Wood App. No. WD-02-041, 2003-Ohio-3991, at ¶ 18, quoting Detling v. Chockley (1982),70 Ohio St.2d 134, 136. Because punitive damages are awarded for punishment, rather than compensation, "a positive element of conscious wrongdoing is always required." Watt, supra, at ¶ 18. Further, "[t]his element has been termed conscious, deliberate or intentional," and "requires the party to possess knowledge of the harm that might be caused by his behavior." Id. Finally, "[a] second element inherent in the award of punitive damages is that something more than mere negligence is always required," and this concept is "reflected in the use of such terms as `outrageous,' `flagrant,' and `criminal,' and requires a finding that the probability of harm occurring is great and that the harm will be substantial." Id., at ¶ 19.
 {¶ 59} In the present case, the trial court did not explain in its decision why it awarded punitive damages, nor did the court, as noted by appellants, make a specific finding of malice. While the evidence in this case may be sufficient to support a finding that appellants' conduct evinced a "conscious disregard for the rights of others that had a great probability of causing substantial harm," so that appellants acted with malice, the trial court failed to so find. We recognize that there may be instances where, even in the absence of specific findings, it may be fairly inferred from the record that the trial court fully considered the factors required to award punitive damages. However, in the instant case, given language in the trial court's decision that it was not convinced that appellants "intentionally defrauded" appellee at the time the product was ordered, as well as the court's failure to indicate a finding of malice or to elaborate on why it awarded punitive damages, we are reluctant to make the inference that the trial court fully considered the issue of malice before imposing an award for punishment. Accordingly, we remand this matter to the trial court for additional findings on the issue of malice, and further consideration of the amount of punitive damages, if any, to be awarded.
 {¶ 60} Further, because the appropriateness of an award of attorney fees is dependent upon a finding of malice and the award of punitive damages, we are unable to address, at this time, appellants' challenge to the award of attorney fees. We make clear, however, that, if the trial court makes a finding of malice on remand, the court need not conduct a new hearing on the issue of attorney fees.
 {¶ 61} In light of the foregoing, appellants' fifth assignment of error is sustained to the limited extent that this matter is to be remanded to the trial court to reconsider the issue of punitive damages and to make appropriate findings.
 {¶ 62} Based upon the foregoing, appellants' first, second, third and fourth assignments of error are overruled, appellants' fifth assignment of error is sustained to the extent provided above, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part and cause remanded.
Petree and Watson, JJ., concur.
[1] Although Rocky Gasbarro was listed under appellants' notice of appeal, plaintiff-appellee, Sanderson Farms, Inc., subsequently filed a notice advising this court that Rocky Gasbarro filed a Chapter 7 bankruptcy petition on December 14, 2001. On January 3, 2002, this court filed an entry staying the appeal. On August 24, 2002, appellants Vincent Gasbarro, Alio Gasbarro, Midwest Farms, Inc., Ohio Valley Poultry, Inc., and Alio International, Inc. filed a motion to reactivate the case and lift the stay as to those appellants. By entry filed August 30, 2002, this court lifted the stay as to all appellants other than Rocky Gasbarro.
[2] Vincent Gasbarro, Rocky Gasbarro, Tracie Jo Gasbarro and Alio Gasbarro were the named beneficiaries of the LMB Trust.
[3] The name of this corporation appears as both "Elio" and "Alio" in the record. Alio Gasbarro testified that Alio International also conducted business as Elio International, Inc., Elio International Investment, and Elio Investments International. Unless otherwise designated, throughout the opinion we will use "Alio" in identifying this corporation.
[4] Attached to Plaintiff's Exhibit No. 3 are the "minutes" for Midwest Farms, dated July 26, 1996, and signed by Rocky and Vincent Gasbarro, stating in part that "the shares owned by the shareholders, Vincent Gasbarro and Rocky Gasbarro, have been sold to Eilo [sic] Investments International, Inc." Also attached to the exhibit is a document entitled, "agreement of sale," stating in part that Rocky Gasbarro, "owner of one half of the shares of Midwest Farms, Inc., hereby agrees to sell said shares to Eilo [sic] International Investments, Inc."
[5] Rocky Gasbarro also testified that his father was on the board of directors of Ohio Valley.
[6] Appellants take issue with Perdue's testimony regarding the issue of insolvency because he analyzed current assets and current liabilities but did not take into account the inventory of the corporation. The record indicates, however, that appellants did not provide that information to appellee by way of discovery. Other jurisdictions have deemed significant comparisons of current liabilities and current assets (i.e., working capital) as to the issue of a corporation's ability to pay debts as they become due. See United States v. Vertac
(E.D.Ark. 1987), 671 F. Supp. 595, 610, vacated on other grounds,855 F.2d 856 (C.A. 8, 1988) (table) ("An excess of current liabilities over current assets is an indication of an inability to pay debts as they become due and thus an indication of insolvency"); In re Morse Tool, Inc. (Bankr.D.Mass. 1992) ("The ratio of current assets to current liabilities is a rough measure of a debtor's ability to pay"); Peltz v. Hatten (Bankr.Ct.Del. 2002), 279 B.R. 710, 742 (evidence that company had large working capital indicated ability to pay debts as they become due).